FILED

98 JUN -9 PM 3: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JUN 9 1998

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JERRY W. WILLIAMS, | } |
| Plaintiff, | } |
| | } CIVIL ACTION NO. |
| vs. | } |
| | } CV-96-AR-3248-S |
| SPARTAN, INC., | } |
| Defendant. | } |

MEMORANDUM OPINION

The above-entitled action is now before the court on a motion for summary judgment filed by defendant, Spartan, Inc. ("Spartan"), on March 20, 1998. Plaintiff, Jerry W. Williams ("Williams"), a former employee of Spartan, alleges that the company violated Alabama law by fraudulently inducing him to leave his previous employment and to take a job at Spartan. For the reasons set out more fully below, the court concludes that Spartan is entitled to the relief sought in its said motion.

I. *Pertinent Undisputed Facts*

Spartan is an industrial contractor that specializes in mechanical piping and structural erectors. Exh. B to Pl.'s Resp. at 44. In 1996, Spartan was acting as one the subcontractors on an oil refinery project for Pennzoil in Shreveport, Louisiana (the "Shreveport project"). At all times relevant to this lawsuit, Spartan's president and chief executive officer was Dick Hamby

("Hamby").

In or around April 1996, Williams was informed by a third-party that Hamby wanted to talk to him about an opportunity at Spartan. *Id.* at 41-42. At that time, Williams was working for Rust Construction Services ("Rust") on a project located in Bastrop, Louisiana. *Id.* Hamby subsequently contacted Williams and told him that Spartan was looking for someone to manage a "challenging project" that Spartan had under way in Shreveport. *Id.* at 53.

After his initial contact with Hamby, Williams had additional preliminary discussions with Hamby about the Shreveport project on at least two other occasions. *Id.* at 57-58. According to Williams, during each of these conversations, he asked Hamby if the Shreveport project was going to be profitable. *Id.* at 58. Williams maintains that, each time he posed this question, Hamby would respond that he "felt" or "thought" that the job would profitable. *Id.*; Pl.'s Resp. at 5. Apparently, because "[i]t well known in the industry that if a supervisor loses money on his first project with a company, he will probably be fired, lose his reputation and/or have difficulty being employed in the industry," the profitability of the project was of vital importance to Williams. Exh. A to Pl.'s Resp. at ¶ 5.

Following these preliminary discussions with Hamby, Williams

2

visited Spartan's offices in Atlanta, Georgia, at Hamby's request. *Id.* at 68-69. During this visit, Williams met with Miguel Antonetti ("Antonetti"), Spartan's construction manager. *Id.* at 70, 75-76. According to Williams, when he asked Antonetti about the profitability of the Shreveport project, Antonetti responded that the project "could possibly turn profit" but that "it's going to take a lot of effort." *Id.* at 75.

At some point between his visit to Spartan's office in Atlanta and his visit to the Shreveport project site on May 22, 1996, Williams discussed the opportunity at Spartan with his supervisor at Rust, Michael Radcliffe ("Radcliffe"). *Id.* at 97-98. According to Williams, Radcliffe warned him that, when Hamby had worked at Rust, he was known for "throwing [Rust] into jobs that [were] hard, fast and tough and not necessarily going to make money." *Id.* at 98. Radcliffe says that, during this conversation, he informed Williams that it was well known in the industry that Spartan's Shreveport project was having labor and financial problems. Def.'s Exh. 2 at 8-9, 12-13.

On May 22, 1996, Williams visited the Shreveport project site at Hamby's suggestion. Exh. B to Pl.'s Resp. at 62-65. During the course of this visit, Williams learned that the $7.9 million project was behind schedule and that Spartan's management

anticipated the need for substantial "change orders"[1] in order to complete the project. *Id.* at 87-90, 94-95. Nevertheless, at the conclusion of the site visit, Williams signed an employment contract with Spartan in which he agreed to serve as the manager of the Shreveport project for an annual salary of $82,000 plus benefits. *Id.* at 99-102. Williams reported for work at the Shreveport project on June 1, 1996. Throughout his employment at Spartan, Antonetti served as Williams's immediate supervisor.

In or around August 1996, Spartan negotiated a $9.1 million change order for the Shreveport contract, thereby increasing the total value of the project to $17 million. *Id.* at 117-18. On October 2, 1996, Antonetti discharged Williams for refusing to carry out one of his directives. *Id.* at 133-34. This lawsuit followed.

## II. *Summary Judgment Standard*

Rule 56 states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

[1] According to Spartan, a change order is a term used in the construction industry to denote an increase in the contract amount. Def.'s Br. In Support of Mot. for Summ. J. at n.2. The need for change orders arises where the contractor either has performed work beyond the scope of the initial contract or incurred other unexpected costs. *Id.* Williams does not dispute this description of the term.

4

Rule 56(c), Fed.R.Civ.P. In addition, the Eleventh Circuit has observed that "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." <u>Turnes v. AmSouth Bank, N.A.</u>, 36 F.3d 1057, 1061 (11th Cir. 1994). In determining the existence of a genuine issue of material fact, the court is obliged to review the record and all its inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356 (1986). Spartan has invoked Rule 56.

### III. *Discussion*

Williams alleges that Spartan, through its agent, Hamby, fraudulently induced him to leave his position at Rust Construction by misrepresenting to him that the Shreveport project would be profitable. Compl. at ¶¶ 5-6. To make out a claim for fraudulent misrepresentation under Alabama law, Williams must demonstrate: (1) a misrepresentation of a material fact; (2) made either innocently or willfully to deceive, or recklessly without knowledge; (3) that was justifiably relied upon under the circumstances;[2] and (4) that caused injury as a proximate

---

[2] On March 14, 1997, the Supreme Court of Alabama overruled *Hickox v. Stover*, 551 So.2d 259 (Ala. 1989), and made the "reasonable reliance" standard that was used in all fraud cases prior to *Hickox* applicable once again. See *Foremost Ins. v. Parham*, 693 So.2d 409, 421 (Ala. 1997). However,

consequence. *Lewis v. State Farm Mut. Auto. Ins. Co.*, 705 So.2d 503, 504 (Ala.Civ.App. 1997); *Patten v. Alfa Mut. Ins. Co.*, 670 So.2d 854, 856 (Ala. 1995). In addition, where, as here, one predicates his fraud claim on an allegedly unfulfilled promise, he "must present evidence indicating that at the time the misrepresentation was made the defendant intended not to perform and intended to deceive the plaintiff." *Chris Myers Pontiac-GMC, Inc. v. Lewter*, 697 So.2d 478, 481 (Ala. 1997). In support of its motion for summary judgment, Spartan argues, in essence, that Williams cannot satisfy his prima facie burden. The court agrees for two reasons.

First, the record conclusively demonstrates that, on several occasions prior to signing the contract with Spartan, Williams's either had or obtained information that made any reliance on Hamby's alleged representations that the Shreveport project would definitely turn a profit wholly unjustifiable. For example,

---

in so doing, the Supreme Court indicated that it would apply the reasonable reliance only in fraud cases filed **after** March 14, 1997. *Id.* Therefore, as Williams filed this lawsuit on December 16, 1996, the court will apply the "justifiable reliance" standard announced in *Hickox* to evaluate Williams's claim. The Supreme Court of Alabama has described the justifiable reliance standard as follows:

> "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."

*Hickox*, 551 So.2d at 263 (internal quotations omitted).

Williams admits that, during his initial visit to Spartan's Atlanta office, Antonetti, Spartan's construction manager, advised him that the Shreveport project "could *possibly* turn a profit but [that] it was going to be one of those challenges that [is] going to take a lot of effort." Exh. B to Pl.'s Resp. at 75. Similarly, the undisputed testimony of Radcliffe, Williams's supervisor at Rust, reveals that, before Williams signed the contract, Radcliffe warned him that the Shreveport project had the reputation in the industry of "having [labor] problems" and of "not being the most profitable." Def.'s Exh. 2 at 8, 12, 13. According to Radcliffe, because Rust had an ongoing project in Louisiana, "everybody had heard about the Spartan project in Louisiana."[3] *Id.* at 13. Furthermore, Williams testifies that, during a visit to the Shreveport project site, he learned that, although some forty (40) percent of the time allotted in the construction schedule had elapsed, only about twelve to thirteen percent of the construction was, in fact, complete. Exh. B to Pl.'s Resp. at 87-89. In other words, prior to signing the contract with Spartan, Williams was aware that the Shreveport project was significantly behind schedule. Finally, Williams admits that, during that same visit to the project site, Hamby

---

[3] Recall, at the time Spartan approached Williams about taking over the Shreveport project, he was working for Rust on a project in Bastrop, Louisiana. Exh. B to Pl.'s Resp. at 42.

7

informed him that the project could not be completed for the original contract price and that substantial "change orders" would be required in order to finish the project. *Id.* at 94-95. In the court's view, when these examples are taken together, they combine to form a red flag that flaps too loudly in the breeze to allow Williams to say that he "justifiably relied" on any representation that the Shreveport project would be profitable for Spartan. *Cf. Oswald v. Met. Life Ins. Co.*, 968 F. Supp. 639, 647 (M.D.Ala. 1997) (concluding that plaintiffs could not have justifiably relied on alleged misrepresentations where they possessed knowledge that contradicted alleged misrepresentations). This is especially true when one considers Williams's eighteen (18) years of experience in the construction industry and his knowledge of the many variables that impact upon a project's potential profitability.[4] Exh. B to Pl.'s Resp. at 30-32.

Second, Williams puts forward no evidence to indicate that, at the time Hamby allegedly misrepresented that the Shreveport

---

[4] For example, according to Williams's affidavit testimony, in order for him to determine whether the Shreveport project would be profitable, "[he] would have needed to know how far [Spartan] had progressed ... [and] what the labor market in the geographical location was like...." Exh. A. to Pl.'s Resp. at ¶ 5. Significantly, the record indicates that Williams had both pieces of information before he signed the contract with Spartan. As noted above, he was aware that the project was badly behind schedule. Likewise, Williams admits that, during one of his initial conversations with Hamby, he was aware that finding enough qualified workers to staff the Shreveport project in "West Louisiana and East Texas" would be a challenge. Exh. B to Pl.'s Resp. at 61. Thus, the evidence shows that Williams had sufficient information concerning two important variables of profitability to know that Hamby's alleged representations about the Shreveport project were, at a minimum, unreliable.

8

project would be profitable, Hamby actually knew that it would not be profitable and sought to hide that fact from Williams. Indeed, the record makes clear that he cannot do so. When asked in his deposition if he had a judgment as to whether Hamby knew that the Shreveport project would not be profitable when he allegedly made representations to the contrary, Williams responded, "I have no knowledge of that." *Id.* at 219-20. Obviously, in view of this concession, it is clear that Williams cannot demonstrate that Spartan had the intent necessary to satisfy his prima facie burden.

As Williams has failed to make out his prima facie case for fraud, the court now concludes that summary judgment in favor of Spartan is appropriate.

### IV. *Conclusion*

The court will enter a separate and appropriate order in keeping with the conclusions reached hereinabove.

DONE this ___9th___ day of June, 1998.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE